## Continuation of Application for Search Warrant

Based on my knowledge, training and experience, and the investigation of law enforcement officers with personal knowledge and with whom I am working, I, Eric Shaffer, being duly sworn, depose and state as follows:

## INTRODUCTION AND BACKGROUND

1.      I am a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and a police detective with the Kalamazoo Department of Public Safety (KDPS).  I have worked as a police officer at KDPS for over 17 years and am currently assigned to the Criminal Investigation Division.  My responsibilities include the investigation of criminal violations of Titles 18 and 21 of the United States Code.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued.  As a Special Agent with ATF, my duties include the investigation of alleged violations of federal criminal laws, including 18 U.S.C. § 922(g)(1) (felon in possession of firearms).  I have received training in the investigation of firearms.  I have learned the methods by which firearms are illegally trafficked and possessed through professional experience as well as my association with other members of law enforcement.  Cases involving violation of federal firearms laws often intersect with violations of federal controlled substance laws as well, so my duties often include the investigation of 21 U.S.C. § 841 (possession with intent to distribute controlled substances).  I have learned the methods by which controlled substances are distributed through professional experience as well as my association with other members of law enforcement.

3.      I am currently investigating Cleve Westbrook, born in 2000, for violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearms) and 21 U.S.C. § 841 (possession with intent to distribute controlled substances) (the Subject Offenses).  Based on the information set forth below, there is probable cause to believe that evidence of violations of the Subject Offenses will be found on the following cellular phones: iPhone with a clear case with black trim; iPhone with a teal green back and no case which were seized on May 31, 2023, and are currently in the custody of the Kalamazoo Department of Public Safety (**the Subject Devices**).

4.      This Application requests the issuance of a warrant to examine the **Subject Devices** outlined in Attachment A for evidence of the Subject Offenses.  The categories of electronically stored information and evidence sought are described in Attachment B.

5.      The information contained in this continuation is based on information obtained personally by me and information provided to me by other law enforcement

officers and agents who have participated in this investigation.  This continuation does not contain all the information known as a result of this investigation, but only those facts that I believe are necessary to establish probable cause for the search warrant sought.

## PROBABLE CAUSE

6.      On September 17, 2022, at approximately 0442 hours, personnel from the Kalamazoo Department of Public Safety (KDPS) responded to area of Washington Ave. and March St. regarding a report of shots fired.  Upon arrival, KDPS located a male who was later identified as Demetrius Finley suffering from a gunshot wound. Despite lifesaving measures, Finley died as a result of this gun fire.  The incident is documented in greater detail under KDPS case number 22-013864.

7.      A surveillance video was located that captured portions of this homicide that showed a suspect shooting from the south side of the road on Washington Ave., west of March St.  This surveillance video also showed several subjects and vehicles in the area at that time.  In the area near 1318 and 1322 Washington Ave., several .45 caliber fired cartridge casings were located and collected as evidence.

8.      I know from training, experience, and previous investigations that the 1300 block of Washington Ave. is a known gathering area for the street group "Washington Street Boys" (WSB) to associate and congregate.

9.      In the days following the homicide, KDPS received information from a subject that wished to remain anonymous regarding suspects in this homicide.  This subject provided information in the form of two Facebook profiles that led to the identification of Cleve Westbrook, XX/XX/2000,[1] and Prinston Robison as suspects in the above-referenced shooting.  This subject further stated that they had heard the subject identified as Prinston Robison was the suspect that shot Finley. This subject also provided information that the subject identified as Cleve Westbrook was also present and involved with this homicide.  The Facebook profiles were:

    A. https://www.facebook.com/30boiChulo
       Vanity name: Chedda Bills
       Identified as the profile related to Cleve Westbrook

    B. https://www.facebook.com/rn.forlife
       Vanity name: Preme Blasthisass
       Identified as the profile related to Prinston Robison.

---

[1] His full date of birth is known to me.  I have excluded because it is personally identifiable information.

10.    KDPS knew from previous investigations into Westbrook that he goes by the street name "Chedda Bills," which is also the name on the Facebook account referenced in the paragraph above.  On September 9, 2022, KDPS searched the open Facebook profile page and identified pictures of Westbrook.  He posted three photographs while in possession of a firearm.  Two of the photographs show the handle of a firearm sticking out of his front pocket.  The third photograph shows Westbrook holding the firearm and pointing it toward a stack of money at his feet, as depicted below:



11.    Westbrook is a convicted felon with the following felony convictions: Felony Escape from a Juvenile Facility, Police Officer Fleeing (Third Degree), and Felony Weapons Carrying Concealed (2018); Felony Controlled Substance Possession of Cocaine, Heroin, or Another Narcotic (2022).

12.    In the days following the homicide, information was also received by KDPS that the homicide involving Demetrius Finley was possibly in retaliation for Finley's brother (Demarcus Finley's) shooting another male in 2013.  KDPS located a 2013 homicide where Demarcus Finley was found guilty in a homicide committed in 2013, in the 1400 block of Race St.

13.     During September 2022, KDPS monitored Cleve Westbrook's cell phone GPS location per a state-authorized search warrant that was signed on August 25, 2022.   That warrant is related to Westbook's involvement with illegal firearms. KDPS reviewed the records of the GPS "ping" locations regarding the homicide, which showed the following information:

A. Leading up to the homicide, at 0434 hours on September 17, 2022, Westbrook's "ping" shows him in the area of Washington Ave., with the center of the ping on Washington Ave. between March and James St., the known hangout for WSB members.  The call for the homicide came into KDPS dispatch at approximately 0442 hours.  The next phone "ping" comes through at 0449 hours and shows Westbrook east of Washington Ave., with the center of the phone "ping" at the intersection of I-94 and I-94 business loop.  At 0505 hours, Westbrook then shows to be northbound on I-194, north of I-94 in the City of Battle Creek.

14.     I know from training and experience those who are involved in major incidents, such as a shooting/homicide, will flee the area quickly.  This is done to elude the police from capture, in addition to elude retaliation from associates of the victim.

15.     KDPS was also investigating a May 11, 2022, shooting on the 700 block of North Westnedge Ave. in Kalamazoo. This incident is documented in greater detail under KDPS case number 22-006500.  On September 20, 2022, a surveillance video was located that had been previously saved by KDPS as part of the investigation into the May 11, 2022, shooting.  In the video, two males were observed shooting two different guns toward an unknown person/target.  It also appears someone fires back at these two males from a location west of where the camera footage captures.  Fired ammunition casings belonging to a .45 caliber and a .40 caliber gun were located and collected as evidence.

16.     One of the males in this surveillance video from May 11, 2022, is observed firing a black semiautomatic handgun.  This male is wearing a blue mask partially covering his face; however, longer dreadlock hair and the subject's eyes are visible.  This surveillance video was shown to KDPS Detective Greg Day, who has had previous contacts with Cleve Westbrook.  Detective Day identified this male as Cleve Westbrook.  Based on this information, Westbrook is believed to be present in both incidents were spent casings are located from the same .45 caliber firearm.

17.     On September 22, 2022, a felony arrest warrant in state court was issued for Westbrook for firearm violations stemming from the May 11 incident.

18.     On September 22, 2022, KVET investigators contacted Westbrook during a traffic stop to arrest him on his outstanding warrant from the previous

shooting incidents.  During a search incident to arrest, Westbrook was found to be in possession of a loaded Sturm, Ruger & Co., Inc., Model EC9s, 9mm pistol with serial number 457-60233.

19.     After contact was made with Westbrook at the traffic stop, a subsequent search warrant was executed at 3326 W. Main Street, Apartment 103, which KVET knew to be where Westbrook was staying.  During the execution of the search warrant at the residence, various items of evidentiary value were located, including the following:

|   |   |   |
|---|---|---|
| i.    | Tabulation item #1:  | Anderson Manufacturing, AR-15 pistol with serial number 19351857 |
| ii.   | Tabulation item #2:  | loaded magazine from item #1 |
| iii.  | Tabulation item #3:  | clear unloaded Glock .45 magazine |
| iv.   | Tabulation item #4:  | Iver Johnson Arms 12-gauge pump action shotgun with serial number 20E-9507 |
| v.    | Tabulation item #5:  | weapon laser sight/flashlight |
| vi.   | Tabulation item #6:  | blue mask |
| vii.  | Tabulation item #7:  | .357 ammunition cartridges |
| viii. | Tabulation item #8:  | .45 ammunition cartridge |
| ix.   | Tabulation item #9:  | Jardis operational digital scale with residue |
| x.    | Tabulation item #10: | empty box for Sig Sauer brand .45 ammunition |

20.     An ATF Interstate Nexus Evaluator performed an Interstate Nexus Determination on the firearms.  He determined the Anderson Manufacturing, Model AR-15 pistol was manufactured and/or distributed from the State of Kentucky.  The Iver Johnson Arms 12-gauge shot gun was manufactured by "Armed Guns" in the country of Turkey.  The Sturm, Ruger & Co., Inc., Model EC9s, 9mm pistol, serial number 457-60233, was manufactured and/or distributed from the State of Arizona.

21.     This case was documented under KDPS case number 22-014149 and was presented to an Assistant United States Attorney for the Western District of Michigan.  On February 14, 2023, Westbrook was indicted in the U.S. District Court for the Western District of Michigan for two counts of being a felon in possession of a firearm.  (1:23-cr-020 (PLM); R.1, Indictment).  An arrest warrant was issued.  As of May 30, 2023, Westbrook had not yet been arrested in connection with his federal warrant, and he remained at large.

22.     On May 31, 2023, KDPS and the Kalamazoo Valley Enforcement Team (KVET) was conducting surveillance of 3326 W. Main Street, Apt. 103, in an attempt to locate and arrest Westbrook for his outstanding warrant.  While conducting

surveillance of the residence, KDPS observed both Westbrook and his girlfriend carrying items to the north end of the building in boxes and bags. KDPS could see a U-Haul truck parked to the north of the building; however, it is unclear whether they were dropping the items off in the U-Haul.

23.    KDPS observed Westbrook exit the residence carrying a basket of clothes. Westbrook wheeled the basket south on the sidewalk toward a black GMC Envoy parked in the apartment parking lot. KVET investigators contacted Westbrook and took him into custody while he was wheeling the basket of clothing down the sidewalk.

24.    During a search incident to arrest of Westbrook and his property, investigators located a loaded Sturm, Ruger & Co., Inc., Model P90 .45 caliber pistol with serial number 662-20255, wrapped in a pair of men's jeans.

   a. An ATF Interstate Nexus Evaluator performed an Interstate Nexus Determination on the firearm. He determined it was manufactured and/or distributed from the State of Connecticut.

25.    As officers were waiting for a patrol car to arrive, Westbrook's girlfriend exited the apartment and spoke with Westbrook. Westbrook told her to go back inside the apartment and get his two cell phones, which she did. When she exited the apartment with Westbrook's cell phones, she handed them to an officer. The phones were: an iPhone with a clear case with black trim, and an iPhone with a teal green back and no case **(the Subject Devices).** Both phones had the same screensaver on them, which showed the back of a man's body.

26.    Following the discovery of the loaded firearm, KDPS obtained a search warrant for 3326 W. Main Street, Apt. 103. They seized two digital scales, sandwich baggies (which I know in my training and experience to be a common packaging material for the distribution of controlled substances), and approximately 45 grams of fentanyl, which was tested by the Kalamazoo Forensic Laboratory. Based on my training and experience, I know that this amount of fentanyl is beyond the amount that would be kept by a user of fentanyl. During a search of the residence, Westbrook, and his property, no user paraphernalia was located. The items were in the following locations:

   a. One digital scale was in a kitchen drawer next to Westbrook's parole discharge paperwork. The digital scale was covered in a white powder residue; the Kalamazoo Forensic Laboratory tested it and determined it was positive for cocaine residue. On the kitchen island was Westbrook's W-2 and social security card.

b. The fentanyl, second digital scale, and packaging materials were in a maintenance closet in the bedroom situated at the southeast portion of the apartment.  Based on my training and experience, I also know drug dealers will use a digital scale to weigh and package illegal narcotics for sale.  All of these items kept in the same location are consistent with a drug packaging kit.  Also in this bedroom was men's clothing, including size 34 men's pants.  The firearm located during the search incident to arrest of Westbrook was found in a pair of men's size 34 pants.

27.     Based on my training and experience, participation in numerous firearm and narcotics investigations and financial investigations relating to illegal firearms and narcotics, and based upon discussions with other law enforcement officers, I know:

A. It is common for convicted felons to have family members, close friends and/or significant others, purchase accessories and ammunition for them.  Illegal firearms users and traffickers use mobile telephones to facilitate the purchase and sale of illegal firearms.  Mobile phones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so firearms traffickers use the devices in an effort to avoid detection by law enforcement.  People often carry their cellular phones with them at all times.  Mobile phones often contain evidence indicative of illegal firearms possession and  trafficking, including records of incoming and outgoing calls and text messages with suppliers and purchasers of firearms; voicemail messages; photographs of firearms, coconspirators, or currency; customer and supplier contact information; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high crime areas or evidencing the route used in trafficking illegal firearms. Additionally, illegal firearms traffickers typically maintain and use multiple mobile phones, often in the names of nominees, to facilitate sales, and frequently switch phones to evade detection by law enforcement.  Further, these types of devices are used to access social media websites such as Facebook, Instagram, etc.  In my training and experience, I know that illegal firearms possessors and traffickers use social media assessed via cell phones with increasing frequency to communicate with suppliers and purchasers.

B. It is common for illegal firearms possessors to take and maintain photographs of themselves and their colleagues with firearms and cash displayed as the tools and proceeds of their illegal activity, and to keep either physical or electronic copies of those images.  The images are often stored on smart phones, computers, and other digital devices, as well as on social media websites such as Facebook, Instagram, etc., and accessed via computers and cell phones. Digital evidence can be found for a long period of time on computers, cell

phones, and other devices because a forensic examiner can access even temporary and deleted files, as well as internet history, long after they are accessed or created by the user.

C. Cellular phones also generate internet use history that can reveal the websites or internet queries entered by the person using the device, including searching for the addresses of various businesses or other locations.

D. Further, cellular phones and similar devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, firearms traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of firearms.

E. Convicted felons are not able to legally possess firearm or firearm ammunition. Therefore, firearms and ammunition obtained by convicted felons are obtained illegally.

F. Drug traffickers will often possess firearms to protect themselves, product, and profits from the sale of illegal narcotics.

G. Drug traffickers frequently use cellular phones and other electronic devices to facilitate drug trafficking.  Cellular phones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so narcotics traffickers often use the devices in an effort to avoid detection by law enforcement.  Cellular phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls and text messages with suppliers of narcotics; voicemail messages; photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high drug trafficking areas or evidencing the route used in trafficking narcotics.

H. Additionally, drug traffickers typically maintain and use multiple cellular phones to facilitate sales, and frequently switch phones to evade detection by law enforcement.  Further, these types of devices are frequently used by drug traffickers to access social media websites such as Facebook, Instagram, etc. In my training and experience, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics.

I. Drug traffickers use electronic devices such as cellular phones to further their activities by, for example, producing and maintaining drug ledgers and other financial records, photos/videos of drug trafficking and/or associates, and other

related digital files.  Storing this information can be intentional by the user, such as saving an e-mail or saving the location of one's favorite websites in "bookmarked" files.

J.  I also know from training and experience that drug traffickers use cameras, often which are part of a cellular phone, to take photos and videos of narcotics, currency, high value items and coconspirators.

28.    Based on the above information, as well as the evidence we have that Westbrook takes photographs of himself with firearms and posts firearms photographs on social media, there is probable cause to believe that evidence of possessing firearms and/or ammunition would be found on the **Subject Devices.** There is also probable cause to believe that evidence of possessing and distributing narcotics would be found on the **Subject Devices.**

29.    The **Subject Devices** are currently in storage at the Kalamazoo Department of Public Safety. The **Subject Devices** are stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Devices** were seized.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.    The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

31.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32.    *Forensic evidence.*    As further described in Attachment B, this application seeks permission to locate forensic electronic evidence that establishes how the **Subject Devices** were used, the purpose of the use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to

the search for "indicia of occupancy" while executing a search warrant at a residence.

33.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34.     *Manner of execution.*  Because this warrant seeks only permission to examine **Subject Devices** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35.     Based on the above facts, I submit there is probable cause to believe that the **Subject Devices** described in Attachment A contain evidence and fruits of crimes, as further described in Attachment B, specifically relating to violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearms) and 21 U.S.C. § 841 (possession with intent to distribute controlled substances) in the Western Judicial District of Michigan.

<u>**Attachment A**</u>
**Description of Devices to be Searched ("Subject Devices")**

The property to be searched is:

- iPhone with a clear case with black trim; and
- iPhone with a teal green back and no case.

The **Subject Devices** are currently secured at the Kalamazoo Department of Public Safety, 150 E Crosstown Pkwy., Kalamazoo, MI 49001.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## <u>Attachment B</u>
## Information and Evidence to be Seized

The following digital information that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearm) and 21 U.S.C. § 841 (possession with intent to distribute controlled substances):

A. Evidence concerning the acquisition, possession, or sale of firearms or ammunition, including records that help reveal their whereabouts and digital photographs or video files depicting firearms or ammunition, or that relate to the purchase of a firearm or ammunition;

B. Digital photographs or video files of controlled substances, scales, packaging material, and other drug paraphernalia;

C. Digital photographs or video files displaying bulk U.S. currency;

D. Electronic communications including email, text messages, multimedia messages, and communications through social media networks and apps relating to firearms or ammunition possession, purchase, and transfer;

E. Electronic communications including email, text messages, multimedia messages, and communications through social media networks and apps relating to controlled substance possession, purchase, and sale;

F. Information concerning controlled substance or firearm transactions stored in tools used to accept and transmit payment for controlled substance purchases (e.g., applications such as Chime, Cash, Venmo, and Paypal);

G. Information used to protect controlled substances (such lists of stash locations, passcodes for locked physical storage devices, and passcodes for protected digital storage devices containing drug proceeds);

H. Records of controlled substance purchases and outstanding controlled substance debts (e.g., drug ledgers);

I. Evidence showing how the proceeds of illegal sales of controlled substances were received and where they are stored;

J. Lists, records, notes, or similar files documenting firearms possession or transactions and/or identifying individuals involved in those transactions;

K.  Audio files including voice mail messages or chats relating to firearms possession or transfer;

L.  Audio files including voice mail messages or chats relating to controlled substances;

M.  Evidence of user attribution showing who used or owned the **Subject Devices** at the time items and records described in this warrant were created, edited, or deleted, such as phone calls, internet searches, photos and videos;

N.  Records of things evidencing the use of the internet, including;

   a.  Records of Internet Protocol (IP) addresses used; and

   b.  Records of internet activity, including firewall logs, caches, browser history and cookies, bookmarked or favorite webpages, search terms that the user entered into any internet search engine, and records of user-typed web addresses; and

O.  Evidence showing where the devices were located during the time period described above (e.g., geolocation data).

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.